IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL A. O., | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 4:23-CV-110-JFJ |
| | ) |
| MARTIN J. O'MALLEY,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
|       Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Michael A. O. seeks judicial review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his claim for disability benefits under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. For the reasons explained below, the Court affirms the Commissioner's decision denying benefits. Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

**I.     General Legal Standards and Standard of Review**

"Disabled" is defined under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is an impairment "that results from anatomical, physiological, or psychological

---

[1] Effective December 20, 2023, pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley, Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A medically determinable impairment must be established by "objective medical evidence," such as medical signs and laboratory findings, from an "acceptable medical source," such as a licensed and certified psychologist or licensed physician; the plaintiff's own "statement of symptoms, a diagnosis, or a medical opinion [is not sufficient] to establish the existence of an impairment(s)." 20 C.F.R. §§ 404.1521, 416.921. *See* 20 C.F.R. §§ 404.1502(a), 404.1513(a), 416.902(a), 416.913(a). A plaintiff is disabled under the Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (explaining five steps and burden shifting process). To determine whether a claimant is disabled, the Commissioner inquires: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"), whether the impairment prevents the claimant from continuing her past relevant work; and (5) considering assessment of the RFC and other factors, whether the claimant can perform other types of work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v). If a claimant satisfies her burden of proof as to the first four steps, the burden shifts to the Commissioner at step five to establish the claimant can perform other work in the national

economy. *Williams*, 844 F.2d at 751. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750.

In reviewing a decision of the Commissioner, a United States District Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See id.* A court's review is based on the administrative record, and a court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* A court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

**II.     Procedural History and the ALJ's Decision**

Plaintiff, then a 49-year-old male, applied for Title II disability insurance benefits and Title XVI supplemental security income benefits on July 30, 2020, alleging a disability onset date of January 1, 1997. R. 21, 313-317. Plaintiff claimed he was unable to work due to conditions including heat-related illness and trouble remembering. *See* R. 342. Plaintiff's claims for benefits were denied initially on February 10, 2021, and on reconsideration on July 2, 2021. R. 88-178. Plaintiff then requested a hearing before an ALJ, and the ALJ conducted a telephone hearing on March 24, 2022. R. 45-87. The ALJ issued a decision on August 12, 2022, denying benefits and finding Plaintiff not disabled because he could perform other work existing in the national

economy. R. 21-38. The Appeals Council denied review, and Plaintiff appealed. R. 1-4; ECF No. 2.

The ALJ found Plaintiff's date last insured was December 31, 2023. R. 24. At step one, the ALJ found that Plaintiff had engaged in substantial gainful activity during the years 1997 and 2002-2011, but Plaintiff had not engaged in substantial gainful activity between the years of 1998-2001 and 2012 to the date of decision. *Id.* At step two, the ALJ found that Plaintiff had the following severe impairments: Neurocognitive Disorder due to a history of Traumatic Brain Injury; Depressive Disorder; Anxiety Disorder; lumbar Degenerative Disc Disease; and left wrist arthritis and mild left upper extremity Carpal Tunnel Syndrome. R. 24-25. The ALJ found his impairments of Gastroesophageal Reflux Disease, Stage III Chronic Kidney Disease, and Hyperlipidemia to be non-severe. R. 25. At step three, the ALJ found that Plaintiff had no impairment or combination of impairments that was of such severity to result in listing-level impairments. R. 25-27. In assessing Plaintiff's mental impairments under the "paragraph B" criteria, the ALJ found that Plaintiff had moderate limitations in all four areas of (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. R. 26-27.

After evaluating the objective and opinion evidence and Plaintiff's statements, the ALJ concluded that Plaintiff had the RFC to perform a range of light work as follows:

> The claimant is able to lift, carry, push or pull up to ten pounds frequently and twenty pounds occasionally. He is able to sit up to six hours in an eight-hour workday and is able to stand and/or walk up to six hours in an eight-hour workday. He is able to frequently handle or finger with the left, non-dominant upper extremity. The claimant is able to understand, remember, and perform simple, repetitive tasks that are learned by rote. He is able to interact with supervisors as needed to receive work instructions, but a job should not involve over-the-shoulder type supervision. He is able to work in proximity to coworkers, but a job should not involve teamwork or other work where interacting with coworkers is necessary in order to complete work tasks. A job should not involve interacting with the

4

> general public. A job should involve no more than ordinary and routine changes to work setting or work duties. A job should not involve work tasks that are performed at a rapid, production-rate pace. A job should not require strict production quotas where the quota is checked more frequently than on a daily basis.

R. 27-28. At step four, the ALJ found that Plaintiff was unable to perform past relevant work. R. 35. Based on the testimony of a vocational expert ("VE"), however, the ALJ found at step five that Plaintiff could perform the unskilled light jobs of Price Tagger, Office Cleaner, and Photocopy Machine Operator. R. 36-37. The ALJ determined the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles ("DOT"), and that portions of her testimony were based on her professional opinion and experience. R. 37. Based on the VE's testimony, the ALJ concluded these positions existed in significant numbers in the national economy. *Id.* Accordingly, the ALJ concluded Plaintiff was not disabled.

### III.   Issues

Plaintiff raises three points of error in his challenge to the denial of benefits: (1) the ALJ erred at step five by not properly incorporating medical expert testimony; (2) the ALJ's mental RFC did not include all of Plaintiff's limitations; and (3) the ALJ's consistency analysis was improper. ECF No. 9.

### IV.   Analysis

#### A.   ALJ's Step-Five Analysis Properly Incorporated Medical Expert Testimony

Plaintiff argues the ALJ failed to properly incorporate the testimony of psychologist Dr. Michael Lace when considering the national jobs available at step five. At the hearing, Dr. Lace testified as a medical expert regarding Plaintiff's mental impairments and functional abilities. R. 54-61, 70-73. Among other findings and opinions, Dr. Lace testified that Plaintiff should be limited to "work settings where tasks are learned in a multimodal kind of way, where not only is

5

information presented verbally but also, perhaps, visually, and maybe even through visual example." R. 57. Upon questioning by Plaintiff's counsel regarding a need for close supervision in the workplace, Dr. Lace testified that Plaintiff could perform "very simple, very routine, very repetitive types of tasks that didn't focus on auditory memory and it was learned, tasks were learned through multimodal means." R. 71. Upon inquiry regarding whether Plaintiff would be unable to learn only through auditory means, Dr. Lace testified that Plaintiff would need to "overlearn," where "he was given, perhaps, a little bit of extra time if it needed to be strictly verbal [instruction] without any other means of learning or approaches." *Id.* Plaintiff's counsel then inquired whether "multimodal" meant that "great care has to be given on how he learns this and, primarily, a lot of visual learning on his part." R. 72. Dr. Lace answered, "Yes, that would definitely be optimal." R. 73.

In the decision, the ALJ summarized Dr. Lace's testimony. R. 28-29. The ALJ found Dr. Lace's opinion persuasive (R. 34), but in the RFC, the ALJ did not adopt the "multimodal" language of Dr. Lace. Instead, the ALJ limited Plaintiff to "simple, repetitive tasks that are learned by rote." R. 27-28. In this regard, the ALJ presented a hypothetical question to the VE that included the limitation of "tasks that are learned by rote," and the VE responded with three light, unskilled jobs that such an individual could perform – price tagger, office cleaner, and photocopy machine operator. R. 83-84. The ALJ adopted these three jobs as available to Plaintiff at step five. R. 37.

Plaintiff argues that, in light of Dr. Lace's testimony, the jobs identified by the VE would not be available to Plaintiff. Plaintiff points out that, upon inquiry from Plaintiff's counsel regarding "multimodal" learning, the VE testified that a requirement to be instructed by visual instructions and inability to follow oral instructions "sounds more like supported employment."

6

R. 85-86. The VE explained that, "just going off of my experience, when you come into the job for like unskilled work, they're going to explain the job to you and you may have some written instructions to do it," but "it would not – visuals and things like that may not be given." R. 86. The VE then testified that the jobs she identified would not be available in substantial numbers if the person required "something other than auditory instructions." *Id.*

Plaintiff's argument is unpersuasive. The ALJ did not limit Plaintiff to "multimodal" learning in the RFC, and the ALJ's hypothetical question to the VE accurately reflected the ALJ's RFC for a limitation of learning "by rote." Plaintiff's argument would require the Court to accept Dr. Lace's "multimodal" learning limitation as part of the RFC, but the ALJ did not adopt this portion of Dr. Lace's opinion. Instead, the ALJ included a limitation of learning "by rote," which may include learning through means other than strictly auditory. While Dr. Lace did not specifically address learning "by rote," Dr. Lace did explain that Plaintiff could learn with "repetition" and "overlearning" if learning was strictly verbal. R. 71. *See* R. 29 (ALJ summarized Dr. Lace's testimony regarding "overlearning" of verbal instruction). This explains how Plaintiff could take instruction for a work task, even if the learning was not multimodal. The ALJ's "by rote" limitation sufficiently accounts for Plaintiff's need to "overlearn" if he would be able to perform simple, repetitive tasks. Indeed, the ALJ explained that the RFC limitation to simple, repetitive tasks that are learned by rote was consistent with Dr. Lace's limitation to simple, repetitive, and routine tasks. R. 37. In addition, the ALJ explained in the decision that Dr. Lace opined that visual learning would be "optimal," for Plaintiff, but Dr. Lace did not opine that visual learning was a functional requirement. R. 37, 72-73.

The Court identifies no error in the ALJ's assessment of Dr. Lace's testimony regarding Plaintiff's learning ability. Nor does the Court find any inconsistency between the RFC and the

7

VE's testimony that a multimodal learning requirement sounded "more like supported employment." R. 86. Accordingly, none of the step-five jobs need to be eliminated.

      **B.**      **Plaintiff's RFC Is Supported by Substantial Evidence**

Plaintiff argues the ALJ should have included in the RFC Dr. Lace's opinion that Plaintiff was limited to tasks that are learned in a "multimodal" way. R. 57. Plaintiff contends that the RFC limitation of understanding, remembering, and performing simple, repetitive tasks that are "learned by rote" is insufficient to accommodate Plaintiff's learning difficulties and is otherwise unsupported in the record.

Plaintiff's argument is unavailing. As explained above, the ALJ specifically discussed Dr. Lace's testimony regarding "multimodal" learning. R. 28-29, 37. The ALJ explained that, "while Dr. Lace did testify that the optimal way of learning for the claimant would be visual, he did not state that the claimant required visual instructions." *Id.* Rather, "Dr. Lace stated the claimant could perform work where tasks are learned in a multi-modal kind of way, where information is presented verbally and also perhaps visually or even through visual example." *Id.* In addition, the ALJ explained that the RFC limitation to simple, repetitive, tasks that are learned by rote was "consistent with Dr. Lace's limitation to simple, repetitive, and routine tasks." *Id.* Elsewhere in the decision, the ALJ explained that the RFC limitation of simple, repetitive tasks that are learned by rote was "[d]ue to mental symptoms such as depression, anxiety, mood lability, anger, irritability, lack of motivation, memory deficits, especially with auditory memory, decreased concentration, and fatigue." R. 34.

In his briefing, Plaintiff urges that learning "by rote" is entirely different than learning in a "multimodal" manner, and Dr. Lace's opinion precludes use of "by rote" in the RFC. However, Plaintiff fails to acknowledge that Dr. Lace later clarified his testimony regarding multimodal learning. Dr. Lace testified that Plaintiff could learn through only auditory means if Plaintiff had

8

the opportunity to "overlearn," where "he was given, perhaps, a little bit of extra time if it needed to be strictly verbal [instruction] without any other means of learning or approaches." R. 71. Dr. Lace's testimony indicates that Plaintiff's learning ability was not limited strictly to multimodal means. The ALJ's adoption of learning "by rote" accounts for Dr. Lace's testimony that "overlearning" would accommodate Plaintiff's learning impairment. According to the Merriam-Webster Dictionary, "by rote" can mean "mechanical or unthinking routine or repetition." https://www.merriam-webster.com/dictionary/rote (last visited March 8, 2024). In this context, learning "by rote" would be consistent with learning by repetitively hearing an instruction or repetitively performing the work task.

Plaintiff further argues in briefing that the VE testified no employer would spend time teaching employees simple tasks by other than auditory means. R. 86. However, the VE did not testify that learning "by rote" would preclude competitive work, and she identified three jobs that would accommodate such a limitation. Again, the Court identifies no error in the ALJ's analysis of Dr. Lace's testimony.

      C.     **ALJ's Consistency Analysis Was Proper**

Plaintiff argues the ALJ's consistency analysis was improper. In evaluating a claimant's symptoms, the ALJ must determine whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *7 (Mar. 28, 2016). If they are consistent, then the ALJ "will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities." *Id.* If they are inconsistent, then the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* Factors the ALJ should consider in determining whether a claimant's pain is in fact disabling include the claimant's

9

attempts to find relief and willingness to try any treatment prescribed; a claimant's regular contact with a doctor; the possibility that psychological disorders combine with physical problems; the claimant's daily activities; and the dosage, effectiveness, and side effects of the claimant's medication. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012); *see also* SSR 16-3p at *7 (listing similar factors); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).[2]

Consistency findings are "peculiarly the province of the finder of fact," and courts should "not upset such determinations when supported by substantial evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). If the ALJ sets forth the specific evidence she relies on in evaluating the consistency of the claimant's subjective complaints with other evidence, the ALJ "need not make a formalistic factor-by-factor recitation of the evidence." *Keyes-Zachary*, 695 F.3d at 1167 (quotations omitted). "[C]ommon sense, not technical perfection, is [the reviewing court's] guide." *Id*.

Here, the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but that his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 29. After reviewing the medical records, the ALJ addressed Plaintiff's alleged memory problems/forgetfulness, other cognitive issues, mental difficulties, back issues, and hand/wrist problems. R. 32. Regarding consistency related to mental impairments, the ALJ noted that Plaintiff was in counseling from 2016 to May 2021 and was discharged after completing his treatment plan objectives to address anxiety,

---

[2] This evaluation, previously termed the "credibility" analysis, is now termed the "consistency" analysis. *See* SSR 16-3p (superseding SSR 96-7p). In practice, there is little substantive difference between a "consistency" and "credibility" analysis. *See Brownrigg v. Berryhill*, 688 F. App'x 542, 545-46 (10th Cir. 2017) (finding that SSR 16-3p was consistent with prior approach taken by Tenth Circuit). Therefore, Tenth Circuit decisions regarding credibility analyses remain persuasive authority.

depression, stress, and anger. *Id.* The ALJ stated Plaintiff had received medication management throughout the record for mental impairments, which remained stable between April 2021 and April 2022, when Plaintiff's medication was increased for depression, difficulty concentrating, memory problems, anger, restlessness, worry, muscle tension, and social anxiety. R. 32-33. Regarding consistency related to his memory and concentration impairments resulting from traumatic brain injury, the ALJ noted that Plaintiff has consistently complained of poor memory and concentration, brain imaging has revealed postsurgical and posttraumatic changes without acute intracranial abnormality, and Plaintiff was diagnosed with unspecified Neurocognitive Disorder due to traumatic brain injury. R. 33. The ALJ noted Plaintiff's areas of poor performance on various cognitive tests, and Plaintiff's demonstrated memory deficits that Dr. Lace categorized as severe but not extreme. *Id.* The ALJ noted that imaging of the brain "has not revealed any acute intracranial abnormality." *Id.* The ALJ further noted that Plaintiff was not treated in the ER or hospital for any exacerbation of symptoms, and Plaintiff's medication regimen has been effective at ameliorating, although not eradicating, Plaintiff's symptoms. *Id.* The ALJ stated that Plaintiff's memory issues were accounted for in the RFC. *Id.*

Plaintiff argues the ALJ's consistency analysis was erroneous, because the ALJ failed to properly consider (1) April 2022 brain MRI and September 2018 brain CT scans, (2) mental health records demonstrating problems with concentration and distraction, (3) Dr. Lace's testimony regarding instruction by verbal means, and (4) Plaintiff's failure to go to the hospital or adjust medication for memory problems.

        **1.**    **Brain MRI and CT Scans**

Plaintiff contends the ALJ erroneously cited an April 2022 brain MRI scan and September 2018 brain CT scan as indicating inconsistency with Plaintiff's testimony regarding his cognitive

11

impairment. *See* R. 749-450 (September 2018 brain CT scan findings), R. 1180-1181 (April 2022 brain MRI findings). Regarding this imaging, the ALJ stated that Plaintiff "has consistently complained of poor memory and concentration throughout the record, which he attributed to a traumatic brain injury ([R. 461-919, 1182-1760, 2062-2067]), and brain imaging has revealed postsurgical and posttraumatic changes without acute intracranial abnormality ([R. 749-750, 1180-1181, 1193])." R. 33. The ALJ stated that Plaintiff had some difficulty on cognitive testing in 2021 and 2022, then stated, "[h]owever, imaging of the brain has not revealed any acute intracranial abnormality." *Id.* The ALJ further explained that Plaintiff "has certainly demonstrated memory deficits, which Dr. Lace categorized as severe but not extreme, and they are accounted for in his [RFC]." *Id.*

Plaintiff argues this discussion "misinterpreted" the brain MRI and brain CT scans, because the ALJ improperly relied on the finding of no "acute" intracranial abnormality, rather than on the findings of underlying encephalomalacia. R. 749 (2018 brain CT finding "postsurgical changes of the left frontotemporal region" with "associated left frontal encephalomalacia" but "no focal areas of abnormal attenuation to suggest acute hemorrhage or infarct"), R. 1180-1181 (2022 brain MRI finding "focal encephalomalacia in the left hemisphere deep to the bone flap particularly in the left frontal and parietal lobes" and encephalomalacia in the "right frontal lobe" but "no intracranial hemorrhage, acute segmental infarction or abnormal enhancement," and noting impressions of "[p]revious left craniotomy," "[u]nderlying encephalomalacia," and "[n]o acute abnormality").

Plaintiff's argument is unavailing. The ALJ found Plaintiff's neurocognitive disorder due to a history of traumatic brain injury to be a severe impairment, and the RFC included significant mental limitations. R. 24, 27-28. The ALJ discussed Plaintiff's testimony regarding his difficulty

with memory, Dr. Lace's testimony that Plaintiff would need to "overlearn" with only verbal instruction, the 2018 brain CT scan, and the April 2022 brain MRI scan. R. 28-30, 32. The ALJ's citation of the CT and MRI scans for the proposition that Plaintiff had no "acute" intracranial abnormality was not inaccurate or misleading. While the ALJ did not reproduce every part of the CT and MRI findings, she did accurately state the "impressions" for both scans, including the MRI finding of "[u]nderlying encephalomalacia." R. 32 (citing R. 1181).

Plaintiff takes issue with the ALJ's reliance on the word "acute," because it is undisputed that Plaintiff's traumatic brain injury had occurred years before the MRI and CT scans, and "acute" indicates a sudden onset or worsening condition, as opposed to a "chronic" condition that develops and worsens over an extended period of time. Plaintiff argues that a finding of no "acute" abnormality is therefore meaningless as a means of discounting Plaintiff's testimony that he had chronic memory problems resulting from a years-old injury. However, the ALJ did not rely solely on the imaging results to discount Plaintiff's testimony. As explained above, the ALJ largely relied on Dr. Lace's testimony regarding Plaintiff's functional mental limitations resulting from his traumatic brain injury, and the ALJ appropriately limited Plaintiff's mental capabilities in the RFC based on Plaintiff's "demonstrated memory deficits." R. 33. The ALJ also acknowledged the "postsurgical and posttraumatic changes" finding in the CT scan report and the "encephalomalacia" finding in the MRI scan report. R. 30 (citing R. 749-450), R. 32 (citing R. 1180-1181, 1193). As part of the consistency analysis, the ALJ again acknowledged that brain imaging "revealed postsurgical and posttraumatic changes without acute intracranial abnormality." R. 33 (citing R. 749-750, 1180-1181, 1193).

Plaintiff points to no actual misinterpretation of the MRI or CT scans. Plaintiff only asks the Court to re-weigh the evidence, which is not permitted. *See Hackett*, 395 F.3d at 1172; *Lax v.*

13

*Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (explaining that the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo") (quotation and alterations omitted).

### 2. Mental Health Records

Plaintiff contends the ALJ "downplayed" or ignored numerous mental health sessions at which Plaintiff was reportedly "easily distracted" and had concentration problems. Regarding concentration, the ALJ noted at step two that Plaintiff had moderate limitations in the mental functioning area of concentrating, persisting, or maintaining pace. R. 27. In support, the ALJ noted that Plaintiff "sometimes presented as easily distracted," citing two behavioral health therapy sessions in 2018 and 2019. *Id.* (citing R. 713, 738).

Plaintiff acknowledges the ALJ's discussion but argues the ALJ should have compared Plaintiff's testimony regarding his concentration problems with these mental status observations. Plaintiff further argues the ALJ insufficiently discussed the fact that these therapy sessions were 30 to 50 minutes in length, which is less than the minimum two hours of concentration required to perform unskilled work. *See* SSA Program Operations Manual System ("POMS") DI § 25020.010(B)(3) (unskilled work requires claimant to "maintain attention for extended periods of 2-hour segments (concentration is not critical)"). Plaintiff additionally argues the ALJ failed to discuss other similar mental status findings throughout the record, and Dr. Lace did not have the opportunity to review these records because they were received after the hearing. *See* R. 571, 1274, 1316, 1329, 1464, 1545, 1556 (mental status findings in 2019, 2020, and 2021, including concentration problems and being easily distracted).

Plaintiff's arguments fail. Plaintiff points to no evidence indicating the ALJ selectively discussed Plaintiff's therapy records or ignored any of the above-cited records. To the contrary,

14

the ALJ addressed Plaintiff's concentration issues and cited the records Plaintiff describes. The ALJ explained that Plaintiff was in counseling from 2016 to May 2021, focusing on relaxing techniques, behavioral modifications, and stress management skills due primarily to anxiety, depression, stress, and anger. R. 32 (citing R. 462-576, 611-724, 1341-1375, 1632-1759). The ALJ noted that Plaintiff was discharged from therapy in May 2021, after completing his treatment plan objectives related to mood stabilization, anxiety, and depression. *Id.* (citing R. 1228-1229).

The Court finds the ALJ's consistency findings regarding the severity of Plaintiff's concentration problems were supported by substantial evidence and legally proper. Specific to concentration issues, the ALJ noted that Plaintiff had "consistently complained of poor memory and concentration throughout the record, which he attributed to a traumatic brain injury." R. 33 (citing R. 461-919, 1182-1760, 20162-2067). The ALJ was not required to discuss each therapy visit in the record, and the ALJ otherwise sufficiently discussed Plaintiff's problems with concentration and memory, including relevant mental status findings. The additional cited therapy records are cumulative of the records the ALJ did discuss, and the fact that those visits were 30 to 50 minutes in length does not necessarily mean Plaintiff would be unable to concentrate for two-hour periods during the workday. Dr. Lace reviewed some of those therapy records and still found Plaintiff had only mild to moderate concentration limitations (R. 57). There is no indication that review of additional cumulative therapy notes would affect such analysis.

### 3. Inability to Understand Verbal Instructions

Plaintiff contends the ALJ's consistency findings failed to address consistency between Plaintiff's statements that his memory is worse with verbal conversations and Dr. Lace's testimony that Plaintiff would need repetition, or "overlearning," of verbal-only instructions. R. 71, 79.

Plaintiff argues this comparison would be "critical," because the VE testified that employers would not tolerate this limitation in unskilled jobs.

The Court rejects Plaintiff's argument. The ALJ considered Plaintiff's testimony regarding memory problems, and she accepted Dr. Lace's testimony that Plaintiff would need to "overlearn" with additional instruction if Plaintiff received only verbal instruction. R. 29. While the ALJ accepted Plaintiff's testimony that he had "demonstrated memory deficits," the ALJ also noted that Dr. Lace categorized those deficits as "severe but not extreme. R. 33. The ALJ did not credit Plaintiff's testimony as to the severity of his memory deficits. In support, the ALJ explained the RFC was supported by Dr. Lace's testimony, as well as findings from the psychological consultative exam showing "marked difficulty" with auditory memory but average visual memory. *Id.*

Further, contrary to Plaintiff's argument, the VE did not testify that a requirement to have verbal instructions repeated would preclude competitive employment. As explained above in Part IV.B, the RFC limitation of learning "by rote" sufficiently accommodated Plaintiff's learning impairment, and the VE testified that there were jobs in the national economy that someone with such a limitation could perform. R. 84. The VE testified that an individual who was unable to follow oral instructions and who needed to be instructed by visual instructions would be eligible for "supported employment." R. 86. However, this limitation was not part of the RFC, and Dr. Lace's testimony did not include a "visual instruction" requirement. While Dr. Lace testified that visual learning would be "optimal" for Plaintiff, he did not state that it was a requirement. R. 72-73. Accordingly, the Court identifies no error in the ALJ's consistency analysis of Plaintiff's learning limitations as it related to Dr. Lace's testimony.

### 4.  Emergency Room Visits and Medications

Finally, Plaintiff contends the ALJ's consistency findings erroneously included findings related to memory and concentration that Plaintiff "was not treated in the ER or hospital for any exacerbation of symptoms and . . . the only medication adjustment Ms. Mulanax has made since April 2021 was to increase Lamotrigine in April 2022, which indicates the regimen she prescribed is effective at ameliorating – although not eradicating – the claimant's symptoms." R. 33.  Plaintiff argues it was improper to downplay Plaintiff's memory deficits by means of irrelevant findings, because individuals do not go to the ER or take medications to address memory problems.

Plaintiff's argument fails.  First, it is unclear from the decision whether the ALJ's comments in this regard are referring strictly to concentration and memory issues or to Plaintiff's mental impairments generally.  These comments are not specific to a particular condition, referring only to "symptoms." R. 33.

Second, the ALJ's discussion is accurate regarding Plaintiff's history of treatment and medication adjustments, which may relate in part to memory issues.  In April 2022, when Ms. Mulanax adjusted Plaintiff's Lamotrigine prescription, treatment notes indicated that Plaintiff was being treated in part for depression.  R. 1182-1183.  Symptoms under "depression" included "difficult concentration/indecisiveness – memory problems [have] been gradually happening and worse in the past 6 months – he had MRI and it showed old damage from TBI, has neurology referral." R. 1182.  Therefore, it appears Plaintiff's treatment for mental impairments included treatment for problems with concentration and memory.  The ALJ's notation related to treatment history and medication likely related, at least in part, to Plaintiff's allegations regarding memory and concentration, as well as his other mental impairments.

In sum, the ALJ's discussion of Plaintiff's subjective complaints and the objective evidence satisfies 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), and SSR 16-3.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision finding Plaintiff not disabled is **AFFIRMED.**

**SO ORDERED** this 14th day of March, 2024.

**JODI F. JAYNE, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**